NUMBER 13-00-342-CV

 

                             COURT OF APPEALS

 

                   THIRTEENTH DISTRICT OF TEXAS

 

                                CORPUS CHRISTI

 



 

R & R CONTRACTORS
AND

R & R OILFIELD SERVICES, INC.,                                           Appellant,

 

                                                   v.

 

MARY TORRES, INDIVIDUALLY

AND ON BEHALF OF THE
ESTATE

OF GREGORIO TORRES,
JR.,

ABEL TORRES, ROBERT
TORRES

AND BEATRICE TORRES,                                                      Appellees.

 



 

                        On appeal from the 319th District Court

                                  of Nueces
County, Texas.

 

 



                                   O P I N I O N

 

                     Before Justices Hinojosa, Yañez, and
Castillo

                                  Opinion by Justice Castillo

 








Appellants,
R&R Contractors and R & R Oilfield Services, Inc. (hereinafter
appellant or AR & R@)[1]
employed Gregorio Torres, Jr., a truck driver, who, during working hours near
quitting time, died after a thousand-pound tank slipped from a sling and
crushed his lower body.[2]   Appellees, 
his widow, Mary Torres, and his children, filed a gross negligence
action under the Texas Workers= Compensation
Act for wrongful death.[3]  Tex.
Lab. Code Ann. '408.001 (Vernon
1996).  The case was tried solely on the
issue of exemplary damages.  A jury found
R & R grossly negligent and awarded $200,000.00 in punitive damages.  The trial court rendered judgment on the jury=s verdict.  R & R raises two issues on appeal:  (1) whether the evidence was legally
sufficient to support the jury=s finding of
gross negligence, and (2) whether the trial court improperly refused to require
the plaintiffs below to prove gross negligence by clear and convincing
evidence. We reverse and remand the judgment of the trial court.

FACTUAL
BACKGROUND








R & R has
raised the issue of legal sufficiency of the evidence.  In considering legal sufficiency points, a
reviewing court must consider all of the record evidence in the light
most favorable to the party in whose favor the jury entered a verdict and
indulge every reasonable  inference
deducible from that evidence in favor of that party. Hines v. Comm=n for Lawyer
Discipline, 28 S.W.3d 697, 701 (Tex. App. B Corpus Christi 2000, no pet.)(citing Formosa
Plastics v. Presidio Eng=rs, 960 S.W.2d
41, 48 (Tex. 1998)).  Accordingly, the
record before us reflects the following.[4]

On October 3,
1995, Torres was a truck driver for R & R, having been employed with the
company for four years.  He was licensed
to transport hazardous materials and his job entailed delivering fuel tanks or
pipe and similar materials to work sites. 
At trial, R&R=s construction
foreman, Thomas Sliney, testified that on the day of the incident, he had used
the cherry picker to move a small building to another part of the yard.[5]  At about 3:20 p.m., near quitting time, he
was parking the cherry picker when Torres, who was standing next to the
tank atop the trailer, signaled him to unload the tank from the trailer and
signaled where he wanted the tank placed. 
The intent was to unload the tank and set it on top of concrete curb
stops, its usual location, over fifty feet away.  Sliney drove the cherry picker toward the
rear of the trailer upon which Torres had now climbed.  








Sliney saw that
Torres had secured a chain from the tank onto the lifting hook on the cherry
picker, but he did not see how the chain was secured around the tank
itself.  He could not see both sides of
the tank and so could not see exactly how the chain was hooked.  Using the cherry picker, Sliney lifted up the
tank and began reversing the cherry picker as Torres got off the trailer.  Once off the trailer, Torres proceeded to
help guide the tank by holding on to a rail, also called a skid, at its
bottom.  As Sliney reversed and the tank
cleared the trailer, the end of the tank opposite him tilted downward, and,
since Torres was still holding onto the bottom of the tank at the other end,
its weight lifted him up approximately one foot off the ground.  Either letting go or losing his grip,
Torres fell to the ground flat on his back. 
At about the same time, the chain securing the tank released and the
tank fell on Torres=s lower
body.  At the time the tank was lifted
from him, Torres was alive.  Later that
day, he died as a result of his injuries. 









Sliney did not
check the tank before lifting it, and so he did not know whether it contained
fuel and did not know its weight.  He did
not know whether the tilting of the tank happened because of fuel shifting
inside it or whether Torres pushed too hard when holding on to it.  He denied that it was important for a crane
operator to check the load before lifting it and explained, AAs a crane
operator, you can=t get out and
check everything that happened.  You have
to depend on the people, the experience of the people that are rigging for you
to secure the load.@  Stating that operating safety equipment
involved some degree of risk, he admitted he was Anot experienced in the rigging of this
particular tank,@ had not moved
this kind of tank previously, and that Avery rarely@ is a lift done
Aall by
yourself.@  Adding that the chain Torres used Acould be a
proper chain@ Aif it had been
rigged differently,@ he testified, A[t]hat chain
was capable of lifting that tank.@  Offering other ways the load could have been
secured, he explained that, although he thought Torres=s method was
correct, he would have Arigged it differently@ by using Aeither lifting
lugs@ or Aa different
type of lifting device,@ which would
have been safer.  He suggested that
Torres could have hooked the chain Ainto the
lifting eyes.  He could have wrapped it
around the leg coming off the skid, wrapped it and hooked it.@  When asked if the chain was long enough to
have put it into the lifting eyes, he responded that he did not know if the
chain was long enough but believed it was.  


Sliney also
explained that a tag line is a rope Aused to tie
onto something when you=re moving it
with a crane to guide it, control it when you=re lifting it up in the air, or if it=s a very large
object.@[6]  He testified that in this case a tag line was
Anot necessary,@ offering that
the safer procedure would have been for Torres to guide the load with his
hand.  When asked again whether the load
was secured correctly, he responded, AIt was my
assumption that it was correct, just due to the fact that he had just loaded
this tank and he had moved this tank before, and he, I assume, that he rigged
it the same way.@[7]  But, he Apersonally
probably would have rigged it differently.@  He Apersonally
probably would have wanted it more secure. 
I may have B should have
used either lifting lugs or used a different type of lifting device.@    








Regarding the
company=s safety
manual, Sliney said it contained the responsibilities and duties for job safety
for foremen and supervisors.  He acknowledged
that the goal for on-the-job safety was for an employee to stay away from a
suspended load and the load at issue was a suspended load.  In his opinion, the ultimate responsibility
for making sure the proper lifting equipment was used was that of Torres,
explaining, AHe was the
truck driver.  He was in charge of that
truck, in charge of loading it and unloading it.@ 
Also, in his opinion, the responsibility for making sure the load was
properly secured was that of Torres.  In
his opinion, Torres was a qualified cherry picker operator.  When asked who held the responsibility of
clearing the area of the lift, Sliney answered, AWell, it=s the people working their=s [sic]
responsibility.  If someone is there that
doesn=t know any
better, you will tell them, >Move, get out
of the way.=  But when someone has experience at it, they
know what to do.@  He believed it Anormally would be a safe enough distance@ between Torres
and the tank, with Torres having his hand on it, Afor a small move like that.@   








When asked if
the way the move was executed Ais acceptable,
and that=s not a safety
violation of any of the safety rules,@ Sliney
responded, ANo,@ based upon
training and experience in the years he had working with equipment.  He added, AThere should have been no danger in this
situation@ and believed
the incident occurred because of Torres. 
He denied he had any responsibility to ensure Torres made the right
decisions.  He admitted having Asomewhat
responsibility@ that the chain
had the strength to lift the tank.  He
admitted he had the responsibility to stop the lift if he determined the
equipment was wrong or was being used improperly.  He added that, if anyone around Ahad seen
something wrong, noticeably wrong, they could have stopped it,@ including
himself.  

Sliney further
testified he was Asomewhat
familiar@ with safety
rules and regulations regarding the operation of heavy equipment and about
particular chains and slings to use.  He
acknowledged that the rules were to Aprevent
accidents.@  Sliney admitted following safety rules was
important and that the more safety rules were violated, the greater the risk of
injury.  When asked if he knew a safety
policy for R & R that referred to removing people from the lift area, he
responded that he did not know.   He said
that the company president, Richard Custer, had hired him to perform
supervisory jobs as a crane operator and as a construction foreman.  R & R did not test him to determine the
level of skill and qualifications he had to operate cranes.  

Employed with
the company since 1992, Timothy Pritchard, the safety manager, testified that
he conducted safety meetings on a weekly basis unless, in his absence, he
designated the office manager or supervisors to conduct them.  The meetings lasted anywhere from ten to
thirty minutes and, while the employees remained standing, they were allowed to
eat their breakfast during the meetings. He explained that a rigging manual
comprehensively details Aevery possible
aspect . . . about crane capacities, anything that has to do with rigging up a
load to be lifted and moved,@ although, at
the time of the incident, he did not believe he Aeven knew what it was.@  He did not believe Torres to be qualified to
operate a cherry picker.  








Because the
company president hired equipment operators, Pritchard would Aassume@ an employee
had the right to operate the equipment, unless he saw Asomething
obviously dangerous.@   Other than employee feedback regarding
operation in an unsafe manner, he had no procedure to determine or monitor an
employee=s skill and
experience level with regard to the operation of heavy equipment such as a
cherry picker.  

When asked who
was responsible for making sure the slings were properly attached, Pritchard
answered, A[t]he ultimate
responsibility falls on the cherry picker operator.@  The responsibility for making sure that
people were clear of a load Awould also fall
with the cherry picker operator.@  If the crane operator saw that the chain
slings around the load were not secured properly, he had the responsibility to
stop the lift.  In Pritchard=s opinion, the
chain used to unload the tank in this case was not the correct one to use, the
manner in which it was used to secure the tank was also not correct, and both
were violations of company safety rules and federal government rules.[8]  That Torres remained near the lift was also
violative of safety standards, all known to a qualified crane operator.  In his opinion, Sliney violated known safety
standards.  








Upon
questioning by R & R=s counsel,
Pritchard also testified about subjects covered in safety meetings during
1995.  He testified regarding the subject
he discussed with attendees during the June 21, 1995 safety meeting, which both
Torres and Sliney attended, regarding crushing accidents.  He advised employees that Acrush accidents
have occurred because of being in a hurry or not letting others know . . . what
we are going to do so that they can allow forgetting [sic] in the way.@  From Pritchard, the jury heard about an
accident in which one employee attempted to move a rig while another employee
was beneath it in front of the rear wheels. 
The jury also heard that the leading type of accident up to June of that
year for R&R was Acrushing
incidents,@ including an
employee who Acrushed his
thumb in a lathe, another crushed his finger in a gate, another crushed his leg
between two pieces of pipe.@  Pritchard instructed the employees to always
keep a safe distance from equipment to avoid being crushed from mechanical
failure or operator error.  He further
instructed employees to never Aget under any
suspended load or equipment part.@  








According to
Pritchard, although a tag line was not used in unloading the tank, it would
have been a safe procedure.[9]  He never trained or provided to Torres
information regarding how to properly rig heavy equipment.  He acknowledged that a qualified operator
would immediately have recognized the load was improperly secured and that part
of a supervisor=s
responsibility was to enforce safety rules and ensure proper equipment was
used.  The jury viewed, while Pritchard
explained, a video tape showing the proper method of unloading the tank,
including the use of a wire rope sling to drag, not lift, the tank off the
trailer and a tag line Aallowing
partial control of the load@ without the Ahelper getting
too close to the load.@  After Torres=s death, Sliney told Pritchard that, prior
to the incident, he had considered the manner in which Torres secured the tank Astrange.@   

Jack Larks, a
forensic engineer and independent consultant in job and workplace safety, was
the expert testifying for the Torres family. 
His field of expertise centered on Aany job and
workplace safety requirements.@  In his opinion, the particular chain should
not have been used, Torres should not have been near the load, and the ultimate
responsibility for ensuring that the lift was made safely and properly was that
of the crane operator.  He added that,
while Torres was anywhere within ten feet of the suspended load, which is the
danger zone, the crane operator should have immediately stopped the lift and
made sure Torres got out of the way. 
When asked if the manner in which the equipment was used created an Aextreme degree
of risk considering the probability and magnitude of potential harm to
employees,@ he replied, ADefinitely.@  When asked if Afor any crane operator to proceed with the
lift under the circumstances in this case amounts to conscious indifference to
the rights, the safety and welfare of Mr. Torres,@ he responded, AYes.@  He added that Athis was an unsafe lift.  This constituted an imminent danger to people
in the vicinity of that load.@  He concluded that Athis
constituted gross negligence, because the standards and regulations were
violated.  Even an experienced operator
should know you don=t lift when
anybody is close to the suspended load.@








He added that
OSHA law requires an employer to furnish safe equipment and a safe place of
employment.  Regarding heavy equipment,
Larks testified that OSHA mandates that an employer Apermit only
those employees qualified by training or experience to operate equipment and
machinery@ and that the
employer @instruct each
employee in the recognition and avoidance of unsafe conditions.@  In his opinion, a qualified crane operator: 

is one who has
demonstrated his ability to operate a crane, and then, also, operate it safely
with regard to knowledge of rigging practices, whether a load has been properly
and safely rigged, and that the operator demonstrates, through performance and
written tests, that he has the requisite knowledge and skill to recognize safe
or unsafe operations since a crane operator is responsible for the lift.  

 

He added that
cranes Ahave one thing
in common, they become dangerous if the operator is not educated,
qualified and trained.@  He explained that a rigger is Aan individual
who=s qualified by
training, education, experience, and supervision to attach equipment or devices
to loads so that they may be safely lifted with regard to weight mass
distribution and control.@  Truck drivers, such as Torres, are Aqualified at
driving the vehicle and seeing that the load is secured on the truck@ but are Anot responsible
for rigging and seeing that the load is lifted or lowered safely.@  Important in unloading, hand signals between
a rigger and crane operator are listed in the regulations.  

The president
of the company, Richard C. Custer, Jr., testified he had experience operating a
A15 ton crane cherry
picker@ and considered
himself a qualified operator, but did not feel comfortable enough to train
someone to operate a crane.  He hired
Sliney to Aoperate the
equipment@ and to run
jobs as a supervisor.  








After the
incident, Sliney told him he had doubts about the way the tank was hooked and
the chain used, but did not question it because Torres knew what he was
doing.  Sliney explained to him that
after backing up the crane, he stopped in order to lower the tank, at which
time the tank Astarted
tilting.@  As reported, as Torres reached up, the tank
flipped and Torres fell, with the tank then falling on him.  Custer explained that Torres was reportedly Aon the end of
the tank closest to the cherry picker@ about twelve
or fourteen feet in front of the crane. 
Custer would not have allowed Torres to remain near the load while the
lift was being done, he would not have used the chain used, he would not have
secured the load in the manner secured, he would not have done the lift knowing
the way it was secured because it created a risky and dangerous situation, and
any qualified operator would have known that. 
He acknowledged that Sliney should have immediately recognized that the
chain was improper for the lift, since the chain was one used to tie down
equipment on the trailer.  He admitted
that Sliney had the ultimate authority to decide whether to do the lift.  He testified, ATom Sliney=s a competent crane operator, but he made
a mistake . . . a serious mistake.@  Explaining why he considered Sliney a
competent crane operator, Custer stated, AUp to this time
he=d been working
in the yard, we never had no incidents with him. Since that time, his
employment with R & R, there has never been any other incidents, and he=s been an
excellent employee.@         








The jury also
heard the testimony by deposition of Richard Paul Whitney, Sr., who had been an
eighteen-year employee of R & R.  As
a construction superintendent, his opinion was that Sliney should not have
continued the lift until Torres Agot out of the
way@ because Ait=s putting him
in danger.@

The last
witness for the plaintiffs below was Mary Torres, who testified she

had been
married to Torres for thirty-two years. 
Abel, Beatrice and Robert were born of the marriage.[10]  She testified that Torres died at about 6:30
p.m. on October 3, 1995.    

For R & R,
Monty Keller testified that he had worked with R & R since 1992 and was an
assistant mechanic foreman at the time of the incident.  He recalled Torres parked the tractor-trailer
he was driving in front of the shop at about 3:20 p.m., ten minutes before
quitting time.  Torres signaled him to
approach and asked if he wanted the diesel tank in its usual place.[11]  Keller responded that he wanted it moved
somewhere else because of traffic congestion in the area and recommended Torres
wait until morning so that he would Ahave a lot of
help@ unloading
it.  Although he attended safety
meetings, Keller had not read the company safety manual for over two
years.  As a supervisor, he had the
responsibility to train his employees regarding safety procedures and had the
authority to hire his employees with the consent of Custer, the company
president.   

THE STANDARD OF PROOF








We begin by
considering R&R=s second issue,
in which it maintains that the trial court improperly refused to require
appellees to prove gross negligence by clear and convincing evidence.  Appellant complains of the trial court=s refusal to
submit the gross negligence question under a Aclear and convincing evidence@ standard and,
instead, submitting a charge to the jury which contained the gross negligence
question under a Apreponderance
of the evidence@ standard.[12]  Appellant argues that, for all causes of
action seeking exemplary damages which accrued after September 1, 1995, the Aclear and
convincing@ standard
applies under the mandate of civil practice and remedies code section 41.002(b).  Tex.
Civ. Prac. & Rem. Code Ann. '41.002(b) (Vernon Supp. 2002).  Appellees counter that Chapter 41 did not
apply to their cause of action when it accrued on October 3, 1995, and thus the
trial court correctly submitted the gross negligence question to the jury under
the preponderance of the evidence standard. 

Preservation of
Error








To preserve
error for appellate review regarding a jury instruction, counsel must make an
objection specific enough to enable the trial court to understand the precise
grounds and make an informed ruling.  Tex. R. App. P. 33.1(a); Castleberry
v. Branscum, 721 S.W.2d 270, 276 (Tex. 1986).  The test for determining if a party has
preserved error in the jury charge is whether the party made the trial court
aware of the complaint, timely and plainly, and obtained a ruling.  State Dep=t of Highways
& Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex. 1992).  Where the complaint is that the trial court
failed to submit a particular definition or instruction, the complaining party
must have presented a written request for its inclusion, tendering the proposed
definition or instruction in substantially correct wording.  Tex. R.
Civ. P. 278; Gilgon, Inc. v. Hart, 893 S.W.2d 562, 565 (Tex. App.BCorpus Christi
1994, writ denied).  However, if the
charge contains an affirmative misstatement of the law, an objection suffices
to preserve error.  Religious of the
Sacred Heart v. City of Houston, 836 S.W.2d 606, 613-14 (Tex. 1992).  

The question of
the appropriate standard of proof was raised by appellant in  its third amended answer,[13]
filed January 29, 2000, in which appellant asserted that  chapter 41 of the Texas Civil Practice and
Remedies Code was applicable to the instant action and prayed for the
protections thereof, including the utilization of the Aclear and
convincing@ standard of
proof.  On February 16, 2000,  appellees filed a motion seeking the trial
court=s determination
of applicable law and appellant filed a trial brief in support of the applicability
of chapter 41, again advocating the application of the Aclear and
convincing standard.@  A hearing was held on the same and the trial
court took the matter under advisement. On February 22, 2000, the trial court
entered an order finding that chapter 41 did not apply to the plaintiffs= causes of
action.








During the
charge conference on February 25, 2000, appellant again requested that the
court apply the procedural standards of chapter 41 and tendered  proposed charges and instructions complying
with chapter 41, which included the clear and convincing standard of proof.[14]  Appellant also made a formal objection to the
trial court=s failure to
apply chapter 41 of the Texas Civil Practice and Remedies Code in submitted
questions and instructions to the jury, noting that this failure rendered the
court=s charge
erroneous in several respects, including the standard of proof for finding
exemplary damages, which under the applicable law, was required to be clear and
convincing evidence.  We find that
appellant=s actions amply
preserved this question for our review.

Standard of
Review








The standard of
review for error in the jury charge is abuse of discretion, which occurs only
when the trial court acts without reference to any guiding principles.  In re V.L.K., 24 S.W.3d 338, 341 (Tex.
2000); Fluor Daniel, Inc. v. Boyd, 941 S.W.2d 292, 295 (Tex. App.BCorpus Christi
1996, writ denied).  The trial court has
considerable discretion to determine necessary and proper jury instructions.  In re V.L.K., 24 S.W.3d at 341.  When the trial court refuses to submit a
requested instruction, the question on appeal is whether the requested
instruction was reasonably necessary to enable the jury to render a proper
verdict.  Texas Workers= Comp. Ins.
Fund v. Mandlbauer, 34 S.W.3d 909, 912 (Tex. 2000); see Tex. R. Civ. P. 277.  An incorrect jury instruction is only grounds
for reversal if it probably caused the rendition of an improper judgment.  Tex.
R. App. P. 61.1(a); Louisiana-Pacific Corp. v. Knighten, 976
S.W.2d 674, 675-76 (Tex. 1998). 
Submission of a lesser standard of proof is reversible error.  In the Interest of H., 630 S.W.2d 441, 446
(Tex. App.BCorpus Christi
1982, writ dism=d w.o.j.); see
also Upjohn Co. v. Freeman, 847 S.W.2d 589, 592 (Tex. App.BDallas 1992, no
writ)(application of incorrect standard of proof was abuse of discretion).

Statutory
History

The Texas
Legislature has mandated that a claim for exemplary damages survives  in the case of a workers= compensation
wrongful death claim.  Tex. Lab. Code Ann. '408.001 (Vernon
1996).  This statute implements the
constitutional protection provided by the Texas Constitution in section 26 of
article XVI which reads:

Every person,
corporation, or company, that may commit a homicide, through willful act, or
omission, or gross neglect, shall be responsible, in exemplary damages, to the
surviving husband, widow, heirs of his or her body, or such of them as there
may be, without regard to any criminal proceeding that may or may not be had in
relation to the homicide.  

 

Tex. Const. art. XVI, '26.

 








Texas
Labor Code section 408.001 gives effect to the constitutional provision in the
context of an employee killed by his employer=s acts, omissions or gross negligence,
providing as follows:

(a) Recovery of
workers= compensation
benefits is the exclusive remedy of an employee covered by workers= compensation
insurance coverage or a legal beneficiary against the employer or an agent or
employee of the employer for the death of or a work-related injury sustained by
an employee.

 

(b) This
section does not prohibit the recovery of exemplary damages by the surviving
spouse or heirs of the body of a deceased employee whose death was caused by an
intentional act or omission of the employer or by the employer's gross
negligence.

 

(c) In this
section, "gross negligence" has the meaning assigned by  Section 41.001, Civil Practice and Remedies
Code.  

 

Tex. Lab. Code Ann.'408.001 (Vernon 1996).

                           

Chapter 41 of
the Texas Civil Practice and Remedies Code places limitations on, and standards
for, the recovery of exemplary damages in Texas.  Tex.
Civ. Prac. & Rem. Code Ann.
''41.001-.013
(Vernon 1997 and Supp. 2002).  It applies
to any action in which a person seeks exemplary damages related to a cause of
action, except for those brought under the Texas Free Enterprise and Antitrust
Act of 1983, the Deceptive Trade Practices-Consumer Protection Act,[15]
and actions brought under chapter 21 of the Insurance Code.  Tex.
Civ. Prac. & Rem. Code Ann. '41.002 (Vernon
Supp. 2002).













Prior to 1995,
section 41.002 of the civil practice and remedies code contained a specific
exception excluding the application of chapter 41 for actions brought by an
employee=s beneficiaries
to recover exemplary damages against an employer for the death of an employee
arising out of the course and scope of his employment, where an employer was a
subscriber under the worker=s compensation
laws of the state.   This was part of a Alaundry list@ of fifteen
exceptions to the application of chapter 41.[16]  Act of June 3, 1987, 70th Leg., 1st C.S., ch.
2, '2.12, 1987 Tex.
Gen. Laws  37, 44, as amended by
Act of May 22, 1989, 71st Leg., R.S., ch. 380, '5, 1989 Tex. Gen. Laws 1490, 1492 and Act
of May 27, 1989, 71st Leg., R.S., ch. 1129, '16, 1989 Tex. Gen. Laws 4643, 4652
(subsequently amended in 1995 & 1997) (current version at Tex. Civ. Prac. & Rem. Code Ann. '41.002 (Vernon
Supp. 2002)).  The specified actions were
thus not subject to the limitations of chapter 41, including the then-existing
requirement of a showing of fraud, malice, or gross negligence,[17]
the bar on prejudgment interest, and the cap that limited an award of exemplary
damages to four times the amount of actual damages or $200,000, whichever was
greater. 













In
1995, the Texas Legislature passed significant and far-reaching tort reform
legislation, including Senate Bill 25, which, among other things, amended
chapter 41 to mandate a clear and convincing standard of proof in actions
seeking exemplary damages,[18]  set more stringent caps, and eliminated the Alaundry list@ of exceptions,
providing instead for exceptions in only three of the original fifteen listed
types of causes of action.[19]
Act of April 11, 1995, 74th Leg., R.S., ch. 19, '1, 1995 Tex. Gen. Laws 108, 109 (also at Tex. Civ. Prac. & Rem. Code Ann. '41.002(Vernon
Supp. 2002)).  The exception for actions
brought for exemplary damages for wrongful death actions under workers= compensation
provisions was among those eliminated. 
The final vote passing this bill occurred on April 11, 1995.  It had an effective date of September 1, 1995
and it applied to all causes of action which accrued after its effective
date.  Act of April 11, 1995, 74th Leg.,
R.S., ch. 19, '1, 1995 Tex.
Gen. Laws, 108, 109 (also at Tex. Civ.
Prac. & Rem. Code Ann. '41.002 (Vernon
Supp. 2002)).








On
May 27, 1995, the final vote on Senate Bill 1, the education reform bill, was
taken.  Buried in a bill of over a
thousand pages overhauling the educational system of Texas was a two-page
amendment to section 41.002(b) which was entitled Aconforming
amendment@ and
substituted proper code names and sections for outdated ones in the old Alaundry list.@[20]  Senate Bill 1 went into effect on May 30,
1995.  Act of May 30, 1995, 74th
Leg., R.S., ch. 260,  '9, 1995 Tex.
Gen. Laws 2207, 2473, amended by Act of May 8, 1997, 75th
Leg., R.S., ch.165,  '1.03, art. 4,
sec. 4.01, 1997 Tex. Gen. Laws 327, 328.

Both
versions (S.B.1 and S.B. 25) of '41.002(b) thus
appeared in the statute, with the S.B. 1 listed first, followed by the S.B. 25
version.  In 1997, Senate Bill 878,  a general Ahousekeeping@ bill (Apart of the state=s continuing
statutory revision program@ to make
conforming and other necessary non-substantive corrections to existing laws)
eliminated the version of '41.002(b) as
amended by Senate Bill 1, that is, the section with the Alaundry list@ with updated
names.  Act of May 8, 1997, 75th
Leg., R.S., ch.165,  '1.03, art. 4,
sec. 4.01, 1997 Tex. Gen. Laws 327, 328.








In
2001, an attempt to add a subsection Ae@ to section
41.002, which would have reinstated the exception for wrongful death actions in
workers= compensation
cases, failed.  Tex. H.B. 2537, 77th
Leg., R.S. (2001).                               

Standards for Statutory Construction

This
case is one of statutory construction, and such matters are questions of law
for the reviewing court to decide. 
See Johnson v. City of Fort Worth, 774 S.W.2d 653, 656 (Tex.
1989).  Proper construction of a statute
is a question of law upon which a trial court has no discretion, Walker v.
Packer, 827 S.W.2d 833, 840 (Tex. 1992), hence no particular deference is
given to the trial court=s findings.  Bandera Indep. Sch. Dist. v. Hamilton, 2
S.W.3d 367, 370 (Tex. App.BSan Antonio
1999, pet. denied.).  The court is bound
to construe a statute as written and, if possible, ascertain the legislative
intent from the language used in the statute. 
See Morrison v. Chan, 699 S.W.2d 205, 208 (Tex.
1985).  A reviewing court must look to
the intent of the legislature and construe the statute to give effect to that
intent.  Union Banker Ins. Co. v.
Shelton, 889 S.W.2d 278, 280 (Tex. 1994).

In
the instant case, the question before does not involve the construction of the
language of the subsection of the statute at issue itself, but rather goes to
the legislature=s intent as to
the application of a particular version of the subsection, in light of the
passage of two different amended versions of the same subsection in the same
legislative session.  In ascertaining
this intent, we are guided by the provisions of the Code Construction Act.  Tex.
Gov=t Code Ann. '311.003 (Vernon
1998).  Courts may consider, among other
matters: 








(1)
the circumstances sought to be attained; 

(2)
circumstances under which the statute was enacted; 

(3)
legislative history; 

(4) common law
or former statutory provisions, including law 

on
the same or similar subjects;

(5)
consequences of a particular construction; 

(6)
administrative construction of the statute; and

(7)
title (caption), preamble, and emergency provision.

Tex. Gov=t Code Ann. '311.023 (Vernon
1998).          

We
must also be guided by the principles that, in enacting a statute, it is
presumed that the entire statute is intended to be effective and that the
result is intended to be just, reasonable, and feasible of execution.  Tex.
Gov=t Code. Ann.' 311.021(2),
(3) & (5)(Vernon 1998).   

Analysis








We
first note that the section 41.002(b), as amended in 1995 by Senate Bill 25,
has no exception for worker=s compensation
cases, and has an effective date clause applying the amendment to all causes of
action accruing on or after September 1, 1995. 
See Tex. Civ. Prac. &
Rem. Code Ann. '41.002(b)(Vernon
Supp. 2002); Act of April 11, 1995, 74th Leg., R.S., ch. 19, '2, 1995 Tex. Gen.
Laws, 108, 109.   Normally, this would be
a sufficient indication of legislative intent for us to find that the
legislature intended the changes made by Senate Bill 25 to be applicable to the
present case, in which the cause of action accrued after the bill=s effective
date.  However, Senate Bill 1, enacted
shortly after Senate Bill 25 and prior to the accrual of the cause of action in
the present case, made different amendments to 41.002(b) and had an effective
date of May 30, 1995.  Thus, at the time
that the cause of action arose in the instant case, and until section 41.002
was amended in 1997, there were two versions of section 41.002(b) in the
statute, both with effective dates that would have apparently made them
applicable to the case at bar.  Hence, we
may not simply rely on the effective date expressed in Senate Bill 25, but must
more closely examine the actions and intent of the legislature to determine
which version of 41.002(b) was applicable.

Appellant
asserts that Senate Bill 25, which became effective September 1, 1995 for all
causes of action seeking exemplary damages that arose on or after that date,
eliminated the exception upon which appellees relied.  Thus, appellant argues, chapter 41, including
its clear and convincing standard of proof, was applicable to appellees= case.








Appellees
counter that, by passing the amendments to section 41.002(b)(1)-(15) in Senate
Bill 1 some forty-six days later, the legislature intended to restore the
exceptions eliminated by Senate Bill 25 and that, therefore, these exceptions
remained in effect until they were definitively eliminated by Senate Bill 898
in 1997. They therefore posit that their case should be governed by the law as
it stood prior to the 1995 amendment of Senate Bill 25, despite the effective
date clauses of both Senate Bill 25 and Senate Bill 898, which applied the
amendment eliminating the worker compensation exception (among others) to all
causes of action accruing after September 1, 1995.

Appellant
responds that the amendments made to section 41.002(b)(1)-(15) in Senate Bill 1
were merely conforming amendments to update the statutory references cited
therein for as long as the exceptions remained in place, but were in no way an
attempt to alter the repeal of the exceptions earlier passed in Senate Bill
25.  Therefore, it maintains, on
September 1, 1995, Senate Bill 25 went into effect and the former exceptions to
chapter 41 listed in '41.002(b)(1)-(15)
were no longer effective.  Thus the
amended chapter 41 applied to appellees= cause of
action, which accrued after that date. 
We agree.








The
language of the section of Senate Bill 1 in which the amendment to section
41.002(b) is made indicates it is a conforming amendment, that is,  an amendment to conform the section to
properly reflect existing code and statute provisions.  All the changes made to chapter 41 by this
bill do that, and only that.  Appellees
argue that we should ignore the plain language of the amendment and they assert
that the amendment found in Senate Bill 1 expresses the legislature=s intent to
make a substantive change to its tort reform legislation and reapply the
exceptions it had so recently repealed. 
If the legislature wished, as appellees argue, to undo a major portion
of the work done in Senate Bill 25, a hard-fought and controversial bill, by
changes listed as Aconforming
amendments@ buried deep in
an education bill, we would have expected some clear legislative intent
expressed to this effect.  The mere fact
that the fifteen subsections were restated in the course of making a conforming
change to update the statutory references does not, in and of itself, prove
intent to reenact those sections in opposition to the previous act of repealing
the section,  as the sections were
required to be set out in any amending legislation under the provisions of the
Texas Constitution.  See Tex. Const. art. III, '36 (requiring
that, in order to amend a law, the section to be amended must be reenacted and
republished at length).   However, this
reenactment and republishment of the fifteen exceptions in the amendment made
by Senate Bill 1, as required by art. III, section 36 of the constitution, does
not automatically make the amendment irreconcilable with the amendment passed
in Senate Bill 25.  Tex. Gov=t Code Ann. '311.025(c)(Vernon
1998).  Indeed, the presumption is to the
contrary.  Section 311.025 (c) very
specifically speaks to such a situation, stating that 

 . . . text that is reenacted because of the
requirement of Article III, Section 36, of the Texas Constitution is not
considered to be irreconcilable with additions or omissions in the same text
made by another amendment.  Unless
clearly indicated to the contrary, an amendment that reenacts text in
compliance with that constitutional requirement does not indicate legislative
intent that the reenacted text prevail over changes in the same text made by
another amendment, regardless of the relative dates of amendment.

 

 

Tex. Gov=t Code Ann. '311.025(c)(Vernon
1998).

 

 








Stated
simply, there must be clear proof, other than the mere re-listing of the
exceptions themselves in Senate Bill 1, that the legislature intended to
substantively reenact the exceptions via Senate Bill 1 and thereby supercede
the action taken in Senate Bill 25 to reduce the exceptions from fifteen to
three.  We are unable to find any
evidence of such intent.  None of Senate
Bill 1's bill analyses indicate an intent to reinstate the recently removed
sections and, indeed, explicitly refute this argument,  showing that the amendment in Senate Bill 1
was meant to make conforming and nonsubstantive changes.[21]  Nor have we found, in an extensive review of
the numerous tapes of all the hearings and floor debates of Senate Bill 1,
itself a highly controversial and significant amendment of the education code, any
argument, debate, testimony or even discussion of this change to section 41.002
of the Texas Civil Practice and Remedies Code. 
There is nothing in Senate Bill 1's legislative history to indicate any
intent to repeal the legislature=s arduous
efforts in passing the changes made to Texas tort litigation by Senate Bill
25.  The only expression of any intent
behind this amendment is found in the plain language of its title Aconforming
amendment@ and the
language of the bill analyses, which indicate that it was, indeed, a
conforming, nonsubstantive amendment.


















Additionally,
appellees= theory that
the legislature intended to make a substantive amendment to section 41.002(b)
by way of Senate Bill 1, and so repudiate its action repealing the amendments
in Senate Bill 25,  cannot be harmonized
with the apparent intent of the rest of the statute.  Assuming, as appellees insist, that the
legislature affirmatively wished to repeal its earlier amendment to section
41.002(b) and return the previously listed exceptions to the statute, then
section 41.002(d), which was not amended by Senate Bill 1, would be rendered
completely redundant and unnecessary.  If
the legislature truly wished to undo its amendments to section 41.002(b) made
by Senate Bill 25, such action would necessitate repealing section 41.002(d) as
well.[22]   Furthermore, at least as to wrongful death
actions under section 26, article XVI, if the legislature intended to reinstate
the exception of these actions from the application of chapter 41, it would
have repealed section 41.003(a)(3), also passed as part of Senate Bill 25,
which specifically set the standards of recovery for exemplary damages under
chapter 41 for wrongful death actions such as that before us today.[23]  Tex.
Civ. Prac. & Rem. Code Ann. '41.003(a)(3)
(Vernon 1997).  Sections 41.002(d) and
41.003(a)(3), which were not affected in any way by Senate Bill 1, cannot be
harmonized with the Senate Bill1 version of subsection (b).   The Senate Bill 1 version of 41.002(b)
likewise does not harmonize with section 41.002(a), which was also amended by
Senate Bill 25.[24]  On the other hand, the Senate Bill 25 version
of section 41.002(b) very neatly harmonizes with sections 41.002(a) & (d)
and 41.003(a)(3), with which it was expressly enacted.[25]  Section 41.002(d) clearly indicates a very
deliberate choice on the part of the legislature to reduce the number of
exceptions from fifteen to three, and section 41.003(a)(3) clearly indicates an
express understanding and intent to extend the application of chapter 41 to
wrongful death cases in workers= compensation
actions.  This is supported by the
legislative history as revealed in legislators= comments at public hearings[26]
on Senate Bill 25.  

Applying
Senate Bill 25's version of section 41.002(b) creates a harmonious, logical and
unified chapter 41; applying Senate Bill 1's version of section 41.002(b)
creates irreconcilable conflicts between various sections of chapter 41,
provisions which cannot be enforced, redundancies,  and non sequiters.  We find no support for appellees= argument that
the legislature intended for Senate Bill 1's version of section 41.002(b) to
prevail over the version of 41.002(b) enacted by Senate Bill 25.  








Appellees
alternatively argue that the later-passed bill should control, citing section
311.025(b) of the Code Construction Act. 
Tex. Gov=t Code Ann. '311.025(b)(Vernon
1998).  This rule of statutory
construction only applies if the two amendments cannot be harmonized so that
effect can be given to each.  Id.  

Appellant
asserts that the amendments can be harmonized and so the later-passed rule of
construction does not apply.  It argues
that Senate Bill 1 amended  section
41.002(b)(1)-(15), which was still in effect through August 30, 1995, in order
to bring it in conformity with numerical and title changes for the statutes and
codes cited therein.  When the
substantive amendments of Senate Bill 25 went into effect, the conformed
provisions of section 41.002(b)(1)-(15) were eliminated, except for those
causes of action that had accrued prior to its effective date.  Thus Senate Bill 1's amendment only affected
those causes of action that accrued prior to September 1, 1995.[27]  








We
find appellant=s argument as
to the harmony of the two bills simple and compelling.  This argument has the merit of harmonizing
all the language in the statute, including subsection (d) and the enactment of
section 41.003(a)(3), being consistent with the legislative history of Senate
Bills 25 and 1, and also being consistent with the plain language and
legislative history of the Senate Bill 1 amendment.[28]


Considering
the plain language of the amendments, the appropriate standards of statutory
construction, and the intent of the legislature as revealed in its legislative
history, we find that the version of section 41.002 passed in Senate Bill 25,
extending the application of chapter 41 to all causes of action except for the
three exceptions listed in subsection (d), to be controlling in this case.[29]









Appellees
have argued that the Texas Supreme Court and the San Antonio Court of Appeals
have ruled otherwise, citing Continental Coffee Prod. v. Casarez, 937
S.W.2d 444, 452 n.4 (Tex. 1996) and Waterfield Mortgage Co. v. Rodriguez,
929 S.W.2d 641, 645 (Tex. App.BSan Antonio
1996, no writ).  We note that in Casarez,
the language cited is dicta as the issue was not directly before the
court.  As for Waterfield, the San
Antonio Court of Appeals appears to have recently retreated from its statements
about the applicability of chapter 41 expressed in that opinion.  When the question of whether the amendment of
Senate Bill 1 or Senate Bill 25 was controlling as to the applicability of
chapter 41 to the formerly-listed exceptions was directly placed before the San
Antonio Court of Appeals, it held, as we do today, that chapter 41 applies to
all workers= compensation
wrongful death causes of actions accruing after September 1, 1995.  Hall v. Diamond Shamrock Ref. Co, No.
04-99-0370-CV, 2001 Tex. App. LEXIS 4217, *28-34 (Tex. App.BSan Antonio,
June 27, 2001, no pet. h.).

Having
found that chapter 41, as amended by Senate Bill 25, was applicable to the case
at bar, the proper standard of proof that should have been applied  was that of clear and convincing evidence.  The trial court thus erred in its
determination of the law of the case and abused its discretion in providing the
jury the erroneous preponderance of the evidence standard in the submitted jury
question number one.[30]

Relief

Appellant
cites Wyndham Hotel Co. v. Self, 893 S.W.2d 630, 635 (Tex. App.B  Corpus Christi 1994, writ denied), and Clayton
W. Williams, Jr., Inc. v. Olivo, 952 S.W.2d 523, 529 (Tex. 1997),  for its assertion that, upon finding the
complained-of  charge error, this Court
should reverse and render a take-nothing judgment against appellees, rather
than reverse and remand for a new trial. 
Appellant argues that since appellees had a burden Ato obtain a
finding of gross negligence >by clear and
convincing evidence,=@ and failed to
do so, appellant is entitled to a rendition of judgment under the authorities
cited above.  We disagree. 








Rendition
is only appropriate when the erroneous question is immaterial, that is, where
the answer to the question fails to submit a controlling issue because there is
some missing determination of necessary specific factual predicates to establish
a legal duty which thus renders the question of no legal consequence.  Torrington Co. v. Stutzman, 46 S.W.3d 829,
840 (Tex. 2000).  Where there is no
required determination of predicate facts to establish a legal duty, the
question then is an attempt to submit a controlling issue and is merely defective
as opposed to immaterial. Id.  The
proper relief for a defective, but not immaterial, question is remand.  Id. at 839-40; see also Durham
Transp. v. Valero, 897 S.W.2d 404, 409 (Tex. App.BCorpus Christi
1995, writ denied)(submission of wrong standard of care was a defective rather
than omitted charge and so remand, rather than rendition, was appropriate).

The
question at issue in the present case, utilizing the wrong standard of proof,
is defective, but not immaterial. 
Accordingly, the proper relief is remand, not rendition.

LEGAL SUFFICIENCY OF THE EVIDENCE

Although
we have already found reversible error entitling appellant to a remand, we
nonetheless consider the first issue raised, 
because if the evidence presented was legally insufficient, then
appellant is entitled to a rendition in its favor.

Appellant
maintains that the record in this case supports only a finding of ordinary
negligence and that evidence of simple negligence is not enough to prove either
the objective or subjective elements of gross negligence.  Appellees disagree. 













If
an appellant is attacking the legal sufficiency of an adverse ruling on an
issue on which he did not have the burden of proof, he must demonstrate on
appeal that there is no evidence to support the adverse finding.  Spohn Hosp. v. Mayer, 72 S.W.3d 52, 68
(Tex. App.BCorpus Christi
2001, pet. filed).  The standard of
review for an attack on the legal sufficiency of the evidence requires us to
consider all of the evidence in the light most favorable to the prevailing party,
indulging all reasonable inferences in that parties= favor.  Id.  If
there is any evidence of probative force to support the finding, the court must
overrule the no evidence point.  Id.;
ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997).  If more than a scintilla of evidence is
offered on a fact, the evidence is legally sufficient to support the jury's
finding on that matter.  Kindred v.
Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  In evaluating legal sufficiency, we determine
whether the proffered evidence as a whole rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions.  Transportation Ins. Co. v. Moriel, 879
S.W.2d 10, 25 (Tex. 1994).  AWhen the
evidence offered to prove a vital fact is so weak as to do no more than create
a mere surmise or suspicion of its existence, the evidence is no more than a
scintilla and, in legal effect, is no evidence.@  Con/Chem
Inc., 650 S.W.2d at 63.  It is only
when reasonable minds cannot differ that evidence lacks probative force that it
is Ano evidence.@  Id.  A
challenge to the legal sufficiency of the evidence supporting a vital fact
necessary for recovery will be sustained if there is a total absence of such
evidence, the rules of evidence prohibit consideration of the only such
evidence offered, the evidence offered is no more than a scintilla, or the
evidence offered conclusively establishes the opposite of the vital fact.  Merrell Dow Pharms., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997).  








Appellees
filed a lawsuit for gross negligence pursuant to Texas Constitution article
XVI, section 26 and the Workers= Compensation
Act.  As we have earlier found, appellees= action was
governed by the current version of Chapter 41. 
With the changes in 1995, the definition for Agross
negligence@ was replaced
by a definition for Amalice,@ and currently
there is no definition in section 41.001 for Agross negligence.@[31]  However, the definition for malice under
section 41.001(7)(B) is essentially identical to the old Agross
negligence standard,@ which was
submitted to the jury in this case.[32]  This is the definition that the legislature
now permits, under the terminology of Agross neglect,@ to those
pursuing an action under a statute enacted pursuant to section 26 of article
XVI of the Texas Constitution and hence the appropriate one for our review.[33]  Tex. Civ. Prac. & Rem.
Code Ann. '41.003(a)(3)
(Vernon 1997).  Accordingly, we will rely
on the already established body of case law that interprets the Agross
negligence@ standard.

Gross
negligence involves proof of two elements: 
(1) viewed objectively from the actor's standpoint, the act or omission
must involve an extreme degree of risk, considering the probability and
magnitude of the potential harm to others; and (2) the actor must have actual,
subjective awareness of the risk involved, but nevertheless proceed in
conscious indifference to the rights, safety, or welfare of others.  See Mobil Oil Corp. v. Ellender,
968 S.W.2d 917, 921 (Tex. 1998), citing Moriel, 879 S.W.2d at 23.  In reference to the first requirement, the Aextreme risk@ means the
likelihood of serious injury to the plaintiff.  Id. 
In reference to the second requirement, ordinary negligence rises to the
level of gross negligence when it can be shown that the defendant was aware of
the danger but his acts or omissions demonstrated that he did not care to
address it.  Louisiana-Pacific. Corp.
v. Andrade, 19 S.W.3d 245, 246-47 (Tex. 1999); Burk Royalty Co. v.
Wells, 616 S.W.2d 911, 922 (Tex. 1981). 
Proof of the second element may be made through either direct or
circumstantial evidence.  Moriel,
879 S.W.2d at 23.  








Evidence
of simple negligence is not enough to prove either the objective or subjective
elements of gross negligence.  See  Universal Servs. Co., Inc. v. Ung, 904
S.W.2d 638, 641 (Tex. 1995).  
Furthermore, a corporation may not be held liable for punitive damages
for gross negligence unless the corporation itself commits gross
negligence,  authorized or ratified an
agent=s gross
negligence, was grossly negligent in hiring an unfit agent, or committed gross
negligence through the actions or inactions of a vice-principal.  Ellender, 968 S.W.2d at 921-22.

In
their petition, as amended, the appellees alleged that Sliney, while acting in
the course and scope of his employment, was grossly negligent by failing to
follow the rules and regulations for the safety of employees and others in the
unloading of equipment in that he failed to use the appropriate and necessary
instruments to unload the fuel tank, failed to warn Torres to clear the area
while the tank was being unloaded, and failed to use the appropriate and
necessary personnel to assist in the unloading of the fuel tank, all of which
were known or should have been known by appellant.  Alternatively, they alleged that appellant
failed to provide Torres a safe place to work, failed to provide and enforce
rules and regulations for the safety of employees and others to warn them,
under certain conditions, of the hazards of their employment, and failed to
exercise care in selecting careful and competent employees.  The jury answered Ayes@ to the sole
liability question, ADo you find by
preponderance of the evidence that the gross negligence of R & R Oil Field
Services, Inc. was a proximate cause of Gregorio Torres, Jr.=s death?@   








On
appeal, appellant maintains that appellees= principal
complaints below were that appellant failed to establish sufficient safety
policies and procedures and failed to properly investigate Sliney=s
qualifications before hiring him. 
Appellant contends that the evidence supports neither contention and so
it was not grossly negligent.  It
maintains that: (1) appellant was not grossly negligent; (2) Sliney was not
appellant=s
vice-principal and so his conduct could not give rise to corporate liability
for gross negligence; and (3) Sliney was not grossly negligent.  The Torres family counters that the evidence
supports a finding of gross negligence for the following reasons:  (1) the acts directly attributable to the
corporation support a determination that the corporation itself was grossly
negligent; and (2) the corporation can also be liable if it commits gross
negligence through the actions or inactions of its vice-principal.  

The Objective Element

                                                       1.  Sliney








Viewed
from the standpoint of the actor, under the objective element, Aextreme risk@ is not a
remote possibility of injury or even a high probability of minor harm, but
rather the likelihood of serious injury to the plaintiff.  See Ung, 904 S.W.2d at 641; Moriel,
879 S.W.2d at 22.   Here, the actors are
appellant and its employee, Sliney.  From
the standpoint of the actors, the evidence before the jury revealed that,
immediately prior to the lift, Torres was stationed between the cherry picker
and a thousand-pound tank, which was secured for unloading with a chain
generally used to secure a load while on a trailer.  As Sliney operated the cherry picker to lift
the tank, Torres remained in contact with the load to guide it.  As Sliney reversed the crane, the load became
unbalanced.  While holding onto the tank,
Torres was lifted when it became unbalanced and, upon his releasing it, he fell
and the tank fell on top of him.        Sliney acknowledged the company=s safety manual
and ultimately agreed that an employee should stay away from a suspended load
as provided in the manual.  Pritchard,
the safety manager, testified that at the time of the incident he did not
believe he knew what the rigging manual was. 
He had no system in place to check an employee=s skill or
experience level in the operation of heavy equipment.  We conclude that the evidence is legally
sufficient to establish that Sliney=s executing the
lift with Torres=s proximity to
the tank prior to the lift involved an extreme degree of risk to Torres. 

The
evidence is also legally sufficient to establish that Sliney=s executing the
lift without the proper equipment in place involved an extreme degree of risk
to Torres.   All witnesses questioned
about the proper method to rig the tank agreed that the tank was not properly
secured, the proper equipment for the lift was not used, and Sliney should not
have made the lift until the load was secure. 


                                                        2.
 R & R








In
deciding whether actions are directly attributable to a corporation, the
reviewing court must consider all the surrounding facts and circumstances
rather than  simply judging individual
elements or facts.  Ellender, 968
S.W.2d at 922.  Reviewing the record as
to the corporation=s actions and
inactions, we note that although the appellant company had a Avery
comprehensive@ safety manual
addressing Aevery possible
aspect that you could think of about slings, about crane capacities, anything
that has to do with rigging up of a load to be lifted and moved,@ at the time of
the incident, the safety manager did not know what it was.  The company provided no training as to the
safe rigging of a load.  The company
provided no training as to the proper method to unload.  The video demonstration before the jury
purported to show the proper method to load and unload the fuel tank.  The procedure, however, excluded the use of a
shackle, a u-shaped device which the safety manager anticipated in his testimony
would be used to secure the wire rope to the lifting lug on the tank.  While describing the proper way to secure the
load concurrently with the video presentation, the safety manager testified
that a wire rope would be attached to a lifting lug on the end of the tank with
a device called a shackle.  He then
noticed that a shackle was not used in the video demonstration.  The jury as the sole trier of fact was free
to draw its own inferences from the testimony before it.  

The
company had no procedures in place to monitor the skill or qualifications of an
individual using heavy equipment to make a lift.  Problems were relayed by word of mouth.  Although Sliney, a company supervisor, had
never made a lift of a tank before, he had the unbridled authority to make
it.  Another supervisor, Monty Keller,
had not read the safety manual for over two years although he had the
responsibility to train his employees regarding safety procedures.  There is legally sufficient evidence that the
acts and omissions of appellant, viewed objectively from its point of view,
involved an extreme degree of risk, considering the probability and magnitude
of the potential harm to others.   








The Subjective Element

The
evidence establishes that Sliney was aware of the risk involved.  To Pritchard, Sliney urged that the manner in
which Torres had rigged the load was Astrange@ and to Custer,
he said he Ahad doubts@ about the way
the tank was hooked and the chain was used. 
And, he stated, he probably would have rigged the lift differently.  However, he proceeded with the lift.  

The
safety manager and the company president concluded that a qualified crane
operator would not have made the lift while Torres was in close proximity to
the load. They testified that the chain was not the proper chain to use for a
lift and that the manner it was used to secure the load was also improper.  Conversely, Sliney testified that the chain Acould@ be a proper
chain Aif it had been
rigged differently.@  However, he had no prior experience making a
lift involving that particular kind of tank. 
He did not know the weight of the tank or its contents, if any.  In addition, he would not have used tag lines
to make the lift, whereas, the safety manager testified that tag lines would
have been appropriate.  The video
demonstration of a proper lift appellant presented for the jury showed tag
lines for the lift and no one near the load. 









Excluding
Sliney, the other witnesses testified that the responsibility to ensure the
load to be lifted was secure was that of the crane operator.  The company president testified that Sliney
had the authority to make the lift.  The
evidence before the jury showed that Sliney disregarded safety procedures by
not ensuring that the tank was properly secured, the proper equipment to secure
the tank was used, and Torres was clear of the lift area. 

A
trial exhibit of appellant showed Sliney=s attendance at
a meeting on June 21, 1995, in which Pritchard covered the subject of Acrushing
accidents.@  Pritchard testified that at that meeting, he
reviewed the procedure, stating, AAlways keep a
safety distance from equipment to avoid being crushed from mechanical failure
or operator error.@  He also covered the procedure stating, ANever get under
any suspended load or equipment part, such as a bucket, a blade, boom,
etcetera.@[34]   
The incident leading to the death of Torres occurred less than four
months later.   In its appellate brief,
appellant contends that Torres, who also attended the meeting, Aapparently
disregarded these admonitions.@  So did Sliney.  This establishes that, while armed with
knowledge that the chain as used to secure the load was improper, he proceeded
with the lift despite knowledge of the safety procedure requiring an employee
to maintain a safe distance from the load to be lifted.  His actions were not merely momentary
thoughtlessness, inadvertence, or error in judgment.  Moriel, 879 S.W.2d at 22.   








The
probative evidence establishes that the lift should not have been made while
Torres was in the Azone of danger@ in close
proximity to the load to be lifted and that 
Sliney was consciously indifferent toward the safety of Torres, who was
between the heavy equipment Sliney was operating and the thousand-pound tank to
be lifted, while holding on to the tank. 
We reject appellant=s contention
that Sliney was not grossly negligent. 
Similarly, we reject the contention that appellant was not grossly
negligent.

The
evidence before the jury was that Sliney was a supervisor.  He had the authority to and did operate a
crane on the unquestioned, untested assumption that he could do so safely.  The company president, the company safety
manager, and the company superintendent testified that Sliney should not have
executed the lift until Torres got out of the way because Ait=s putting him
in danger.@  The company knew about perils involving
crushing injuries and employee proximity to loads.  The company, however, gave Sliney the
authority to operate the cherry picker. 
Sliney had the authority to operate equipment and perform a lift without
any prior experience with the particular load to be handled.  There is more than a scintilla of evidence
that the company knew about the peril but did not care.  We hold that the evidence was legally
sufficient to support a finding that the corporation=s own acts and
omissions involved an extreme degree of risk to employees like Torres.  

Relying
upon Hammerly Oaks, Inc. v. Edwards, 958 S.W.2d 387, 391-92 (Tex. 1997),
appellant contends it is not liable for punitive damages because Sliney was not
a vice-principal of the corporation. 
Because we hold that the evidence before the jury was legally sufficient
to support a finding that appellant itself was grossly negligent, we need not
address appellant=s argument
regarding the vice-principal theory of liability. 








The
jury=s answer on
punitive damages was conditioned on a finding of gross negligence.  If there is any evidence of probative force
to support the finding of the jury, the court will overrule the no evidence
point.  ACS Investors, 943 S.W.2d
at 430.  The evidence is more than the
scintilla needed to satisfy a legal sufficiency or Ano-evidence@ standard.  We hold that there is legally sufficient
evidence to uphold the punitive damages award against appellant and, therefore,
overrule appellant=s first
issue.  

CONCLUSION

Having
sustained appellant=s second issue, we
reverse the trial court=s  judgment and remand the case for further
proceedings.  

 

ERRLINDA CASTILLO

Justice

 

Publish.

Tex.
R. App. P.
47.3(b).

 

Opinion delivered and filed

this 27th day of June,
2002.

 











[1]According
to trial testimony, appellants R & R Oilfield Services and R & R
Contractors are the

same
company.  

 





[2]The
parties do not dispute that the event made the basis of the underlying lawsuit
occurred

during and in
the course of employment.

 





3 Appellee Mrs. Torres sued individually and
on behalf of the estate.  Her adult
children Abel,

Robert, and
Beatrice Torres were also plaintiffs below.  






                [4] Witness
testimony is provided chronologically.  

 





[5] Sliney had been
employed with R & R since February 1995. 
He explained that AMiguel and

some of the
people that were working with him@
helped him with the move.  They Ahad
it rigged up and ready when I got there.@  





[6]
He explained that the tag line keeps the load Aunder
control.  If it starts to move, you can
stop

it.@

  





[7] After
the incident, Sliney learned that Torres had transported the fuel tank from a
job site in

Smiley, and
that the tank had been loaded onto the trailer with a backhoe:  AIt
was just drug up on the top of the truck. 
It was not lifted.@  

 





[8] He testified, AThat
chain should not have been used.  . . .
If you=re going to use
a chain sling

to lift an
object, you need what=s called a
two-legged chain sling where you have two sections of chain that go to a
central loop.  The central loop would be
placed over the hook and that way would keep it from sliding like it can there
through the hook.@   He also testified that a Awire
rope sling would have been a more adequate method to rig up that tank for safe
movement . . . .@  





[9] Sliney had
previously testified a tag line would not have been appropriate.





[10] At
the time of trial, Abel was 34, Beatrice was 32, and Robert was 24.  

 





[11] Aside
from supervising repairs of equipment, Keller was responsible for ordering the
tank=s fuel.  Keller knew where he wanted the tank
relocated but needed authorization for the move.  

 





[12]
 Clear and convincing evidence
is that measure or degree of proof that will produce in the mind of the
factfinder a firm belief or conviction about the truth of the allegations a
party seeks to show. State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).  Preponderance of the evidence means the
greater weight and degree of credible evidence. Upjohn Co. v. Freeman,
847 S.W.2d 589, 591 (Tex. App.BDallas 1992, no writ).





[13]
No other answers appear in the record so
we do not know when this question was first raised. 





 

[14]
According to the reporter=s record,
appellant tendered requested jury charge questions one and two and requested
jury instructions one, two, three, six and seven. Requested jury question one,
which appellant claimed submitted the question of damages in a manner compatible
with chapter 41 did not appear in the clerk=s
record.  Requested jury question two,
which asked the jury whether it found by clear and convincing evidence that the
harm to Torres resulted from malice and all of the requested instructions,
including jury instruction one, which sets out the definition of clear and
convincing evidence, appear in the record. 
Appellant=s statement of
matters to be included in the supplemental clerk=s
record (which itself appears in the record) requested that all of its requested
jury questions and instructions be included. 
Pursuant to our authority under Texas Rule of Appellate Procedure
34.5(c), we requested, and received, the missing instruction. 





[15]
Except as specifically provided by section 17.50 of that Act. Tex. Civ. Prac. & Rem. Code Ann. '41.002
(Vernon Supp. 2002). 





[16]
Texas Civil Practice and Remedies Code section 41.002 then
read:

 

(a) This
chapter applies to an action in which a claimant seeks exemplary damages
related

to a cause of
action as defined by Section 33.001.

 

(b) This
chapter does not apply to:

 

(1) an action
brought under the Deceptive Trade Practices Consumer Protection Act (Subchapter
E, Chapter 17, Business and Commerce Code) except as specifically provided in
Section 17.50 of that Act;

 

(2) an action
brought under Chapter 21, Insurance Code; 

 

(3) an action
brought under the workers= compensation
laws of this state (Article 8306 et. seq., Revised Statutes);

 

(4) an action
to recover exemplary damages against an employer by the employee=s
beneficiaries in a death action arising out of the course and scope of
employment where the employer is a subscriber under the workers=
compensation laws of this state (Article 8306 et. seq., Revised Statutes);

 

(5) an action
brought under Chapter 246, Acts of the 63rd Legislature, Regular Session, 1973,
Home Solicitation Transaction (Article 5069-13.01 et seq., Vernon=s
Texas Civil Statutes);

 

(6) an action
brought under Chapter 547, Acts of the 63rd Legislature, Regular Session, 1973,
Debt Collection Practices (Article 5069-11.01 et. seq., Vernon=s
Texas Civil Statutes); 

 

(7) an action
brought under Chapter 54, 91, or 92, Property Code; 

 

(8) an action
brought under the Texas Manufactured Housing Standards Act (Article 5221f,
Vernon=s Texas Civil
Statutes); 

 

(9) an action
brought under the Texas Motor Vehicle Commission Code (Article 4413(36), Vernon=s
Texas Civil Statutes);

 

(10) an action
brought under the Texas Proprietary School Act, Chapter 32, Education Code; 

 

(11) an action
brought under Section 9.507 or Section 27.01, Business & Commerce Code; 

 

(12) an action
brought under Chapter 36, Family Code; 

 

(13) an action
brought under the Health Spa Act (Article 5221, Vernon=s
Texas Civil Statutes);

 

(14) an action
brought under the Business Opportunity Act (Article 5069-16.01 et. seq., Vernon=s
Texas Civil Statutes; or

 

(15) an action
brought under the Texas Timeshare Act.

 

(c) In an
action to which this chapter applies, the provisions of this chapter prevail
over all other law to the extent of any conflict.

 

Act of June 3, 1987, 70th Leg., 1st C.S.,
ch. 2, '2.12, 1987 Tex.
Gen. Laws 37, 44, as amended by Act of May 22, 1989, 71st Leg.,
R.S., ch. 380, '5, 1989 Tex.
Gen. Laws 1490, 1492 and Act of May 27, 1989, 71st Leg., R.S., ch. 1129, '16,
1989 Tex. Gen. Laws 4643, 4652 (subsequently amended in 1995 &
1997)(current version at Tex. Civ. Prac.
& Rem. Code Ann. '41.002
(Vernon Supp. 2002))

 





[17] However,
labor code section 408.001 imposed its own requirement of gross negligence. Tex. Lab. Code Ann. '408.001 (Vernon 1996).

 





[18] The
change of standard of proof was made in a revision of section 41.003 of the
civil practice and remedies code.  Prior
to the 1995 amendments of Senate Bill 25, section 41.003 read:

 

(a) Exemplary
damages may be awarded only if the claimant proves that the personal injury,
property damage, death, or other harm with respect to which the claimant seeks
recovery of exemplary damages results from:

 

(1) fraud; 

 

(2) malice;

 

(3) gross
negligence. 

 

(b) The
claimant must prove the elements of Subsection (a)(1), (a)(2), or (a)(3). This
burden of proof may not be shifted to the defendant or satisfied by evidence of
ordinary negligence.

 

Act of June 3, 1987, 70th Leg., 1st C.S.,
ch. 2, '2.12, 1987 Tex.
Gen. Laws 37, 44 (amended 1995)(current version at Tex. Civ. Prac. & Rem. Code Ann. '41.003
(Vernon 1997)).

 

After the
amendments made in 1995 by Senate Bill 25, section 41.003 reads:

 

(a) Except as
provided by Subsection (c), exemplary damages may be awarded only if the
claimant proves by clear and convincing evidence that the harm with respect to
which the claimant seeks recovery of exemplary damages results from: 

 

(1) fraud; 

 

(2) malice; or

 

(3)
willful act or omission or gross neglect in wrongful death actions brought by
or on behalf of a surviving spouse or heirs of the decedent=s
body, under a statute enacted pursuant to Section 26, Article XVI, Texas Constitution.
In such cases, the definition of Agross
neglect@ in the
instruction submitted to the jury shall be the definition stated in Section
41.001(7)(B).

 

(b)
The claimant must prove by clear and convincing evidence the elements of
exemplary damages as provided by this section. This burden of proof may not be
shifted to the defendant or satisfied by evidence of ordinary negligence, bad
faith, or a deceptive trade practice.

 

(c)
If the claimant relies on a statute establishing a cause of action and
authorizing exemplary damages in specified circumstances or in conjunction with
a specified culpable mental state, exemplary damages may be awarded only if the
claimant proves by clear and convincing evidence that the damages result from
the specified circumstances or culpable mental state.

 

Tex. Civ. Prac. & Rem. Code Ann. '41.003
(Vernon 1997).

 





[19] The
revised section 41.002, as amended by Senate Bill 25 read:

 

(a)
This chapter applies to any action in which a claimant seeks exemplary damages
relating to a cause of action.

 

(b) This chapter establishes
the maximum exemplary damages that may be awarded in an action subject to this
chapter including an action for which exemplary damages are awarded under
another law of this state. This chapter does not apply to the extent another
law establishes a lower maximum amount of exemplary damages for a particular
claim.

 

(c)  Except as provided by Subsections (b) and
(d), in an action to which this chapter applies, the provisions of this chapter
prevail over all other law to the extent of any conflict.

 

(d)  Notwithstanding any provision to the
contrary, this chapter does not apply to Section 15.21, Business and Commerce
Code (Texas Free Enterprise and Antitrust Act of 1983), an action brought under
the Deceptive Trade Practices-Consumer Protection Act (Subchapter E, Chapter
17, Business & Commerce Code) except as specifically provided in Section
17.50 of that Act, or an action brought under Chapter 21, Insurance Code.

 

Act of April
11, 1995, 74th Leg., R.S., ch.19, '1,1995
Tex. Gen. Laws  108, 109 (also at Tex. Civ. Prac. & Rem. Code Ann. '41.002
(Vernon Supp. 2002)). 

 





[20] Specifically,
Senate Bill 1 amended:

 

Subsections (3)
and (4) to change AArticle 8306
et. seq., Revised Statutes@
to ATitle 5, Labor
Code@;   

 

Subsection (10)
to eliminate the words Athe Texas
Proprietary School Act@, and changes A32"
to A132"; 

 

Subsection (15)
to change Athe Texas
Timeshare Act (Article 6573c, Vernon=s
Texas

Civil Statutes)@
to AChapter 221,
Property Code.@

 

Act of May 27,
1995, 74th Leg., R.S., ch. 260, 
'9, 1995 Tex.
Gen. Laws 2207, 2473, amended by Act of May 8, 1997, 75th
Leg., R.S., ch.165,  '1.03,
art. 4, sec. 4.01, 1997 Tex. Gen. Laws 327, 328.





[21]
This particular amendment first appeared in the committee substitute bill and
so there are two bill analyses that mention it: 
the committee substitute version and the enrolled version of S.B.1. The
text of the bill analyses is as follows:

 

SECTION
34. CONFORMING AMENDMENT. Amends Section 41.002(b), Civil Practice and Remedies
Code, to make conforming changes.

 

Senate Comm. on Education, Bill analysis,
Tex. S.B. 1(Committee Substitute Version), 74th Leg., R.S. (1995).

 

 

SECTION
9. CONFORMING AMENDMENT. Amends Section 41.002(b), Civil Practice and Remedies
Code, to make nonsubstantive and conforming changes.

 

Senate Comm. on Education, Bill analysis,
Tex. S.B. 1 (Enrolled Version), 74th Leg., R.S. (1995).

 

 





[22] Subsection
(d) reads: 

 

Notwithstanding
any provision to the contrary, this chapter does not apply to Section 15.21,
Business and Commerce Code (Texas Free Enterprise and Antitrust Act of 1983),
an action brought under the Deceptive Trade Practices-Consumer Protection Act
(Subchapter E, Chapter 17, Business & Commerce Code) except as specifically
provided in Section 17.50 of that Act, or an action brought under Chapter 21,
Insurance Code.

 

Tex. Civ. Prac.
& Rem. Code Ann. '41.002(d)(Vernon
1997).

 

 





[23]
Section 41.003(a) reads:

 

(a)
Except as provided by Subsection (c), exemplary damages may be awarded only if
the claimant proves by clear and convincing evidence that the harm with respect
to which the claimant seeks recovery of exemplary damages results from: 

 

                 . . . .        

(3)
wilful act or omission or gross neglect in wrongful death actions brought by or
on behalf of a surviving spouse or heirs of the decedent=s
body, under a statute enacted pursuant to Section 26, Article XVI, Texas
Constitution. In such cases, the definition of Agross
neglect@ in the
instruction submitted to the jury shall be the definition stated in Section
41.001(7)(B).        

 

Tex. Civ. Prac. & Rem. Code Ann. '41.003(a)(Vernon
1997).

 





[24]
As amended, the section reads: AThis
chapter applies to any action in which a claimant 

seeks exemplary
damages relating to a cause of action.@
Tex. Civ. Prac. & Rem. Code Ann. '41.002(a)(Vernon
1997).

 





[25] That
subsection reads: 

 

(b) This chapter establishes
the maximum exemplary damages that may be awarded in an action subject to this
chapter including an action for which exemplary damages are awarded under
another law of this state. This chapter does not apply to the extent another
law establishes a lower maximum amount of exemplary damages for a particular
claim.

 

Act of April
11, 1995, 74th Leg., R.S., ch.19, '1,
1995 Tex. Gen. Laws  108, 109
(also at Tex. Civ. Prac. & Rem. Code
Ann. '41.002(b)(Vernon
Supp. 2002).

 





[26] At
the February 14, 1995 meeting of the Senate Economic Development committee,
Senator Sibley, in describing the committee substitute commented:

 

AIn
all cases in which punitive damages are available in Texas law, they will be
governed under this bill except for the Texas Free Enterprise and Anti-Trust
Act. We felt that anti-trust actions which were state causes of action should
not be governed by this bill.@


 

The Texas Tort
Reform Act: Hearing on Tex. S.B. 25 Before the Senate Comm. on Econ. Dev.,
74th Leg., R.S.(Audiotape, February 14, 1995)(statement of Senator
Sibley).

 

In laying out changes to the Senate version of the bill made by
the House committee substitute to Senate Bill 25 at the March 27, 1995 meeting
of the House Committee on State Affairs, the chair, Representative Seidlits
described one of the changes as follows:                


 

ASection
41.003(a)(3), I believe that=s
it, it talks about, and there=s
a section in the Texas constitution, section 26, article 16, that actually
talks about, I believe, wrongful death cases, punitive damages and gross
neglect. The bill as written recognizes that the limitations, whatever, in the
bill on punitive damages would apply in those cases under that section and it
gives a definition of gross neglect in the substitute.     

 

And
in [sic] the committee substitute additionally exempts actions brought under
DTPA and/or chapter 21, Insurance Code.@

 

The
Texas Tort Reform Act: Hearing on Tex. S.B. 25 Before the House Comm. on State
Affairs, 74th Leg., R.S.(Audiotape,
March 27, 1995)(statement of Representative Seidlits).

 

All
of the above provisions are part of the final enacted Senate Bill 25 as to '41.002(d)
(enacting the sole three exceptions to the application of chapter 41 B
actions under the Texas Free Enterprise and Anti-Trust Act, DTPA and chapter
21, Insurance Code) and  '41.003(a)(3)
(enacting the standard of gross neglect to be used in worker=s
compensation wrongful death actions for exemplary damages).  Tex.
Civ. Prac. & Rem. Code Ann. ''41.002(d)
& 41.003(a)(3)(Vernon Supp. 2002 & Vernon 1997).

 





[27] In
addition to the Afour months of
legitimacy@ that appellant
argues the Aold@
section 41.002(b)(1)-(15) had from May 27 to September 1, 1995, since the prior
law was continued in existence for those causes of action accruing before
September 1, 1995, Senate Bill 1 would have also served the practical purpose
of making sure that limited continuing law was in conformity with existing
statutory and code provisions.  Act of
May 30, 1995, 74th Leg., R.S., ch.19,'2,1995
Tex. Gen. Laws 108,113, amended by Act of May 8, 1997, 75th
Leg., R.S., ch.165,  '1.03,
art. 4, sec. 4.01, 1997 Tex. Gen. Laws 327, 328. 

 





[28] Indeed,
although not part of the legislative history of either Senate Bill 1 or 25, the
subsequent action of the Legislature in 1997 with Senate Bill 898 and the
failure to pass House Bill 2537 in 2001 seem to even more strongly confirm that
the legislature intended that the sole exceptions to chapter 41 to be those
three actions listed in section 41.002, subsection (d).

 





[29]
There is no dispute that appellees=
cause of action accrued on October 3, 1995, the date of Torres=s
death. Chapter 41 as amended by Senate Bill 25, applies to all causes of action
arising after September 1, 1995 that are not specifically excepted by section
41.002(d). Appellees= cause of
action does not fall under the exceptions of subsection (d).

 





[30] As
the jury charge did not conform to the standards set out in chapter 41, there
were other errors in the questions and instructions submitted to the jury, but
the only one before us on appeal is the question of the standard of proof.





[31] Section
408.001 of the Labor Code, which still contains the Agross
negligence@ language, has
not been amended since 1993, two years prior to the 1995 tort reform
measures.  Tex. Lab. Code Ann. '408.001
(Vernon 1996).

 





[32] Malice
is defined as: 

 

(A) a specific
intent by the defendant to cause substantial injury to the claimant; or

 

(B) an act or
omission

 

(i)
which when viewed objectively from the standpoint of the actor at the time of
its occurrence involves an extreme degree of risk, considering the probability
and magnitude of the potential harm to others; and 

 

(ii)
of which the actor has actual, subjective awareness of the risk involved, but
nevertheless proceeds with conscious indifference to the rights, safety or
welfare of others.                                         

 

Tex. Civ. Prac. & Rem. Code Ann. '41.001(7)
(Vernon 1997).

 





[33] The
statute also permits a person suing for a wrongful death action under Section
26, Article XVI and seeking exemplary damages to prove that the harm came from
a willful act or omission.  Tex. Civ. Prac. & Rem. Code Ann. '41.003(a)(3)
(Vernon 1997).





[34]
At trial, both procedures were read aloud by R & R=s
counsel.